ZELLA NUTTER, *Adm'rx.*, etc. v. THE CHESAPEAKE & OHIO RAILWAY COMPANY, *a corporation, et al.*

(No. 7392)

Submitted November 2, 1932.   Decided November 22, 1932.

*Ben H. Ashworth, W. A. Thornhill, Jr.,* and *D. G. Lilly, Jr.,* for plaintiff in error.

*Fitzpatrick, Brown & Davis,* and *C. W. Strickling,* for defendants in error.

MAXWELL, JUDGE:

Plaintiff as administratrix brought suit in the circuit court of Summers County to recover of the defendant company and J. W. Estep, its engineer, $10,000 for the death of her husband. There was a directed verdict for the defendants. Writ of error followed.

Plaintiff, her husband and their four children came to the flag station of Long Bottom about 5:00 a. m., May 21, 1931, for the purpose of boarding train No. 7, westbound. There was a mist of rain and they sought shelter in a shed maintained by defendant company for the convenience of its passengers. Upon hearing a locomotive whistle in the distance about 5:20, they started to cross the double tracks from the shed to a cinder platform maintained by defendant on the opposite side, a distance of 35 feet from the shed, from which opposite side only they could board a westbound train. The husband and one child were struck and killed and another child injured. They were struck by westbound train No. 1, running fifty-two minutes late and within about twenty-five minutes of the regular time for No. 7. Plaintiff thought train No. 1 was train No. 7, and evidently deceased thought the same. Deceased did not carry a watch. Long Bottom was neither a regular nor a flag stop for train No. 1, but was a flag stop for No. 7. Deceased and his family had lived within five or six hundred feet of the station for two or three years.

On the morning of the accident, deceased found that his clock had stopped in the night. Upon inquiry of a neighbor he was informed that it was ten minutes until four o'clock. It does not appear whether he thereafter set the clock.

Passengers desiring to board westbound trains at the Long Bottom station were in the habit of waiting in the shed until they could hear the train approaching and then, crossing the tracks, they would flag the train from the platform. The evidence discloses that in wet weather passengers did not await

trains on the north platform because of the danger from rocks and earth which fell from an overhanging cliff.

The engineer testified that the train was proceeding at a speed of forty miles per hour; that the bell on the engine was ringing; that he blew six blasts from the whistle about a mile from Long Bottom; that it was light enough to see ahead; and that he was keeping a proper lookout. He stated further that as he came onto the curve about six or seven hundred feet east of the station he could see the shed for a distance of 600 feet and the opposite platform for a distance of 500 feet, but that as he continued to negotiate the curve, and at a distance of 200 feet from the shed, his view was entirely cut off. He said that the first thing that attracted his attention was a woman stepping off the track "directly in front of the engine"; that he next saw "an object roll off the front of the engine like a human body (which later proved to be the body of deceased) and I put on the emergency." He stopped the train within about 700 feet. The fireman stated that he blew the whistle; that the headlight was burning and the automatic engine bell was ringing. He said that he could not see the platform or shed until the train was within 30 feet of them; that he first saw deceased as he was "between the two tracks, crossing in front of the engine or starting over" about 30 feet ahead of the engine; that he could not see the decedent sooner because his view was cut off by the engine, he, the fireman, being on the left side of the engine at the outside of the curve.

A night watchman for the New River Lumber Company testified that a few minutes before the accident deceased asked him the time; that he (witness) told deceased the time and that it would be about forty-five minutes until No. 7 ran, also that he did not know whether No. 1 had run. He stated further that he told deceased that he expected to flag No. 7 to put something on it; that about ten minutes after this conversation deceased was struck and killed.

Plaintiff stated that they had arrived at the station about fifteen or twenty minutes before the accident; that she heard the whistle and heard the train coming down the gorge; that deceased was standing on the inside of the shed watching for the train; that they started across the tracks as soon as they heard the whistle; that she, with two of the children, preceded

deceased in crossing the tracks; that deceased had the other two children with him, and he was close behind her; that she could have seen six or seven hundred feet up the track but that she did not look; that there was nothing to have prevented deceased from seeing the train for the same distance had he looked; and that they walked fast in crossing the tracks.

Plaintiff in her declaration alleges that defendant company was guilty of negligence in maintaining the Long Bottom station where located, and in not operating train No. 1 with due care for the safety of passengers at the station; that the engineer was not keeping a proper lookout, and was driving the train at an excessive speed. The defendants deny all negligence and assert that the decedent himself was guilty of gross negligence which was the proximate cause of his injury.

The witnesses differ as to the distance from the station at which the whistle was blown, but there is no denial of the fact that such signal was given. Plaintiff testified not only that she heard the whistle, but that she "could hear it (the train) coming down the gorge." She stated also that she could have seen in the direction from which the train was approaching for a distance of six or seven hundred feet; that she did not look; and that there was nothing to have prevented decedent from seeing the train if he looked. These facts, coupled with the fact that deceased had lived within five or six hundred feet of the station for two or three years and must necessarily have been more or less familiar with the usual speed and schedules of the trains, impel us to the conclusion that he did not utilize the information at his command and that he neglected to employ his mental faculties for his own safety. We are justified in assuming that inasmuch as plaintiff heard the train approaching, deceased must likewise have heard it. Furthermore, he was told by the night watchman for the Lumber Company that he (the watchman) did not know whether No. 1 had run. This information was sufficient to place deceased on the lookout for a train other than the one he was desirous of boarding.

It appears that, upon arriving at the station, deceased stood just inside the shed and watched for the train. It is highly probable, therefore, that the engineer could not have seen him even in keeping a most alert lookout. But, assuming that he

could and did see him, it does not follow that the engineer should have anticipated that he would attempt to cross the tracks immediately in front of the train.

The decedent was killed by a fast running ''through'' passenger train. For such a train a rate of forty miles per hour was conservative. Fast passenger train service between distant points cannot be maintained if it be required by law that such trains be so operated that they can be materially slowed or stopped at every flag station where, forsooth, some careless person, whether in the role of prospective passenger or otherwise, negligently subjects himself to danger. Such requirement would be unreasonable. The law does not impose it. *Lowry* v. *B. & O. R. R. Co.*, 74 W. Va. 791, 82 S. E. 1101.

Assuming for the purpose of discussion, as insisted by plaintiff, that, inasmuch as train No. 1 was running within twenty-five minutes of the regular time of No. 7, the operatives of No. 1 should have anticipated that some prospective passenger at a flag stop might mistake No. 1 for No. 7, what probable conduct on the part of such passenger should have been anticipated? The answer: reasonable conduct, not gross carelessness.

The law requires no one to anticipate that an unobserved person may do a very foolish thing thereby incurring grave risk of death or serious bodily injury. The engineer and fireman could not have been expected to foresee that any person, for any purpose, would undertake to cross the tracks immediately in front of their rapidly moving engine. And this is true even though we assume, as further contended by plaintiff, that operatives of No. 1 should have taken note of the fact that because of the rain then falling and possible danger from rocks slipping from the cliff on the north side of the tracks at Long Bottom, passengers awaiting westbound accommodation train No. 7 would probably take shelter in the shed on the south side, and might mistake No. 1 for No. 7. Nothing in those facts would suggest that such persons would undertake to cross immediately in front of any train while rapidly moving even though they thought it was the train they were expecting to board.

There are many cases holding railroad companies liable for injuries to passengers at stations. Among them is our own

case of *Pierce* v. *Railroad Co.*, 99 W. Va. 313, 128 S. E. 832. But such cases do not absolve passengers from the exercise of ordinary care for their own safety. The *Pierce* case expressly so states. Railroad companies owe a high degree of care to passengers. And persons are to be considered as passengers when on railroad property for the purpose of taking passage, and when departing from trains. But, always, "A passenger who voluntarily and unnecessarily places himself in a position of danger can not hold the railway responsible for injuries of which his position is the efficient cause * * *" *Fisher* v. *Railroad Co.*, 42 W. Va. 183, 24 S. E. 570.

Plaintiff testified that they started across the tracks "as quick as we heard it" (the train), and that they "walked fast". In the light of the evidence that the whistle was blown at least one-half mile distant from the station, plaintiff is doubtless in error as to the time they started across the tracks. If, immediately upon hearing the whistle, the deceased and his family started across the tracks at even a moderate rate of speed, they should have reached the opposite platform before the train arrived. The distance from the shed to the opposite platform was thirty-five feet. Moving at the conservative rate of four miles per hour (plaintiff says they "walked fast") they would have traversed that distance in a little less than six seconds; at a two-mile rate in twelve seconds; at a one-mile rate in twenty-four seconds. At a rate of forty miles per hour, it required about forty-five seconds for the train to travel a half mile.

Obviously, the deceased knew the train was near but he seems not to have heeded its approach, and staked his life on his ability to reach the opposite side of the tracks before the train bore down upon him. He cast, and lost.

Maintaining the Long Bottom station by the railway company where located was not negligence *per se*. It may be true that because of the danger from rocks and earth which fell from an overhanging cliff in wet weather, the cinder platform on the north side was an unsafe place to await the arrival of trains. But the opposite platform and the shed were safe. It was to be presumed that passengers using the same would act with reasonable caution for their own welfare.

100

"The carrier is exonerated when the proximate and moving cause of the injury was the act of the injured passenger himself; since the general rule is that no one can charge another in damages for negligently injuring him where he himself failed to exercise due and reasonable care in the premises." *Fisher* v. *Railroad Co., supra.*

Plaintiff invokes the doctrine of the "last clear chance". That doctrine is applicable only where both plaintiff and defendant are negligent. We are of opinion that it has not been shown that defendants were negligent. The doctrine therefore is without basis in this case.

Finding no error in the judgment of the trial court, we affirm the same.

*Affirmed.*